HEATHER E. WILLIAMS, Bar #122664
Federal Defender
KARA R. OTTERVANGER
Florida Bar No. 0112110
Assistant Federal Defender
2300 Tulare Street, Suite 330
Fresno, California 93721-2226
Telephone: (559) 487-5561
Kara_Ottervanger@fd.org

Counsel for Defendant
CHARLES GEARHEART

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>vs.<br><br>CHARLES GEARHEART,<br><br>*Defendant,* | Case No. 6:23-po-00079-HBK<br><br>**NOTICE OF MOTION AND MOTION TO SUPPRESS; MEMORANDUM OF POINTS AND AURHORITIES; REQUEST FOR EVIDENTIARY HEARING**<br><br>Date: November 14, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. Helena M. Barch-Kuchta |

**TO: PHILLIP TALBERT, UNITED STATES ATTORNEY; JEFFREY SPIVAK AND CHAN HEE CHU, ASSISTANT UNITED STATES ATTORNEYS; AND SEAN ANDERSON, YOSEMITE LEGAL OFFICER, COUNSEL FOR PLAINTIFF:**

**PLEASE TAKE NOTICE** that on November 14, 2023, or as soon thereafter as this matter can be heard, in the Eastern District of California, before the Honorable Magistrate Judge Helena Barch-Kutcha, defendant Charles Gearheart, through counsel Kara Ottervanger, will move this Court for an order suppressing all evidence and statements obtained as the result of (1) the warrantless search of the vehicle in which Mr. Gearheart was a passenger, and (2) violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

This motion is made pursuant to the United States Constitution, including the Fourth and Fifth Amendments; Federal Rule of Criminal Procedure Rule 12(b); Eastern District of California Local Rule 430.1; and all applicable statutes and case law.

Pursuant to Local Rule 430.1(h), Mr. Gearheart respectfully requests an evidentiary hearing on the issues raised in this motion, which he expects to last between 1-3 hours for testimony and argument. This motion is supported by this Notice of Motion; the Memorandum of Points and Authorities; the record of this case; and such argument and further law and evidence as may be presented at the time of the hearing.[1]

                                            Respectfully submitted,

Dated:  September 25, 2023         HEATHER E. WILLIAMS
                                           Federal Defender

                                           */s/  Kara R. Ottervanger*
                                           KARA R. OTTERVANGER
                                           Assistant Federal Defender
                                           Attorney for Defendant
                                           CHARLES GEARHEART

---

[1] Mr. Gearheart further reserves the right to amend or supplement this Motion with additional information should it become available. Specifically, there are four male rangers (believed to be Rangers Cassling, Blade, White, and Sullens based on Ranger Hesse's written citation) visible on Ranger Hesse's body worn camera footage, for a total of five rangers. However, only Ranger Hesse's report has been produced to Mr. Gearheart and only Rangers Hesse's and Blade's camera footage has been produced to Mr. Gearheart.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     Factual Background

On January 4, 2023, at approximately 1:23 p.m., Ranger Stephany Hesse approached a vehicle parked in a designated parking area along the right side of the road in Yosemite Valley. Ranger Hesse approached on foot as the occupants were opening their doors to exit the vehicle to go sightseeing and asked them to stay in the vehicle. Defendant Charles Gearheart ("Mr. Gearheart") was the back passenger. The vehicle was driven by William Gearheart ("William").

Ranger Hesse identified herself as she shut Mr. Gearheart's door. Ranger Hesse told the driver, William, "[t]he reason I'm stopping you is your registration is expired and I got reports that someone matching this description is driving crazy all over the road." (*Exhibit 1* – Ranger Hesse's body worn camera at 0:46[2]). William advised Ranger Hesse that he had just been pulled over by "another cop" down the road for this. (*Ex. 1* at 0:59). Ranger Hesse asked for William's license and registration, and he provided his driver's license. Seeing that William also had an ID in his wallet, Ranger Hesse asked William to give her both so she can "check and make sure you're not holding two IDs," and William complied. (*Ex. 1* at 1:30) William also advised that he did not have his insurance or registration. When asked if he had anything to connect him to the vehicle, William retrieved and handed Ranger Hesse an old registration from his glove compartment. (*Ex. 1* at 2:03).

As she looked at the document, Ranger Hesse changed the subject of her questioning to drugs and weapons:

> Ranger Hesse:     Any firearms, large knives, weapons in the vehicle?
>
> William Gearheart: No.
>
> Ranger Hesse:     Any marijuana in the vehicle?
>
> Charles Gearheart: [while door closed] uhm, excuse me, ma'am, (inaudible) [opening door] is your body camera on?
>
> Ranger Hesse:     Yes.
>
> Charles Gearheart: Ok, I was just wondering, I just want to make sure.

---

[2] Reference to body worn camera (BWC) footage will be cited as HOUR:MINUTE:SECOND of elapsed time on the video at the start of the cited portion, rather than to the timestamp in the top right corner of the video. When there is no hour applicable, it will read MINUTE:SECOND.

| | | |
|---|---|---|
| 1 | Ranger Hesse: | Yep. Uhm, you know marijuana is illegal in the park, right? |
| 2 | William Gearheart: | Yeah, I was about to say, I was gonna say, we have, we have a little |
| 3 | | bit of marijuana. But yeah. |
| 4 | Ranger Hesse: | Ok, so a little bit is not a big deal. Anything harder than marijuana in |
| 5 | | the vehicle? |
| 6 | Charles Gearheart: | No yeah, no way, we have, we have, you know, a baby, we're just |
| 7 | | having a good time. |
| 8 | Ranger Hesse: | Ok, uhm, when was the last time you smoked? |
| 9 | William Gearheart: | Uhm like this morning, yeah. |
| 10 | Ranger Hesse: | You feel like you are safe to operate this vehicle? |
| 11 | William Gearheart: | I do, yeah. |
| 12 | Charles Gearheart: | It's been at least like 6 hours, at least. Like 12 hours like. |
| 13 | William Gearheart: | It's, yeah. |
| 14 | Woman in front passenger seat: | It's been a while. |
| 15 | Ranger Hesse: | Alright |
| 16 | Charles Gearheart: | We've been up since like 6 in the morning 'cause we got up early to |
| 17 | | come here. |
| 18 | Ranger Hesse: | I'll have you shut your door, just hang tight with me, stay in the |
| 19 | | vehicle, I will be right back with you, alright? |
| 20 | (*Ex. 1* at 2:14). | |

At 3:08 of the video, Ranger Hesse turned to walk back to her vehicle. At 3:42, Ranger Hesse called into dispatch to report "(inaudible) I am gonna need a second for PCS search (inaudible)." Ranger Hesse then read William's license number to dispatch, a minute after she left the vehicle occupants to run William's license. At 5:04, dispatch reported to Hesse "license status expired, (inaudible), five FTAs, no (inaudible)." At 5:32, Ranger Hesse turned to face a male ranger who had arrived on scene and the following conversation occurred:

| | | |
|---|---|---|
| 27 | Ranger Hesse: | Uhm, I am pretty sure this is the that one Delta 1-4 called in. I made |
| 28 | | the, well they stopped on me, expired reg, uh smell of marijuana, a little |

|   |   |   |
|---|---|---|
| 1 | | short, no valid registration, no insurance, and now apparently no |
| 2 | | driver's license. |
| 3 | Male Ranger: | Ok, uhm, gotcha. |
| 4 | Ranger Hesse: | So. |
| 5 | Male Ranger: | Are you thinking that there might be any sort of impairment given the |
| 6 | | odor of marijuana coming out of the car and the driving behavior that |
| 7 | | was reported? |
| 8 | Ranger Hesse: | I asked them the last time they smoked and they said this morning, that |
| 9 | | he was good to drive. There is a kid in the backseat as well, so, if you |
| 10 | | wanna pull out, and start searching, and then I'll probably put paper on |
| 11 | | the driver. And try to get a valid, see if there is a valid driver in there. |
| 12 | Male Ranger: | Ok, what can I help you with? |
| 13 | Ranger Hesse: | Uhm if you wanna start pulling people out and you wanna search? |
| 14 | (*Ex. 1* at 5:23). | |

Ranger Hesse discussed with the two male rangers on scene how to start searching. The third ranger asked Ranger Hesse: "You smelled marijuana, you saw marijuana, or?" to which Ranger Hesse responded: "Yeah, they have marijuana in the car, and driver isn't a valid driver's license, its suspended . . . three adults one kid." (*Ex. 1* at 6:59). At 7:52, one of the male rangers asked William to step out of the vehicle and Ranger Hesse began to speak to Mr. Gearheart as William was being searched. The following exchange ensued:

|   |   |   |
|---|---|---|
| 21 | Ranger Hesse: | So what's gonna happen now is we are gonna search the vehicle, get |
| 22 | | all the drugs out of it, if it's just a little bit of marijuana, that's not that |
| 23 | | big of a deal, but if it's anything harder, now's the time to kinda, speak |
| 24 | | up. Any LSD? |
| 25 | Charles Gearheart: | No. |
| 26 | Ranger Hesse: | Mushrooms? |
| 27 | Charles Gearheart: | No, but we also don't consent to a search. I know that you guys |
| 28 | | probably have the authority to do it, but I just want to be on record, we |

1                          don't consent.

2         Ranger Hesse:     It doesn't matter.

3         (*Ex. 1* at 8:04).

4         Finally, at minute 9:19—over four minutes since Ranger Hesse learned that William was

5 not a valid driver—Ranger Hesse asked Mr. Gearheart: "Is there anybody that's a valid driver in

6 this car?"

7         Charles Gearheart:  I'm a valid driver.

8         Ranger Hesse:     When's the last time you smoked?

9         Charles Gearheart: Uh, like last night.

10        Ranger Hesse:     Ok can I get your driver's license?

11        Charles Gearheart: Yeah.

12        Ranger Hesse:     Did you know he wasn't a valid driver?

13        Charles Gearheart: Uhm, he, I didn't know, but then when we got pulled over, we found

14                                 out essentially, because it expired on his birthday, which was like a

15                                 week ago, maybe, it was the 21st, so it expired on the 21st.

16                   . . .

17        Ranger Hesse:     Ok, can I just get your driver's license, please?

18        Charles Gearheart: Yeah.

19        Mr. Gearheart handed Ranger Hesse his license and Ranger Hesse she told the woman in

20 the front passenger seat that Ranger Hesse's partner was going to take her out of the car. (*Ex. 1* at

21 10:06). Ranger Hesse said to someone: "You can leave the bag in the car." The woman in the front

22 passenger seat got out of the vehicle with a male Ranger without any bags, and Mr. Gearheart took

23 a strap off from around his neck.

24         At minute 10:15, Ranger Hesse called Mr. Gearheart's license into dispatch, and called it

25 in again at 20 seconds later. Dispatch was no longer audible on Ranger Hesse's BWC footage, but

26 Ranger Hesse responded that she copied. Then, one of the male Rangers approached and asked

27 Ranger Hesse "What do you need?" and she responded "Are you gonna take him out?" (*Ex. 1* at

28 12:28). The male ranger asked Mr. Gearheart to get out of the vehicle, and he did. (*Ex. 1* at 12:36)

Mr. Gearheart did not have anything in his hands, but pulled his jacket down over his waist to cover his sagging pants. He was asked to grab the dog from the vehicle, and he complied. Ranger Hesse told dispatch she was "initiating vehicle search status checks (inaudible)." (*Ex. 1 at* 14:23).

The interaction, per Ranger Hesse's camera, lasted one hour, four minutes, and fifteen seconds. A total of five rangers were involved to search the occupants and the vehicle.

## II. This Court must suppress all evidence obtained as the result of the warrantless search of the vehicle in which Mr. Gearheart was a passenger.

"The Fourth Amendment guarantees the right of citizens to be free from unreasonable governmental searches." *United States v. Caseres*, 533 F.3d 1064, 1069 (9th Cir. 2008) (citing U.S. Const. amend. IV). In *Riley v. California*, 134 S. Ct. 2473 (2014), the United States Supreme Court explained that a judicial warrant is generally required to satisfy the Fourth Amendment's reasonableness requirement. *Id.* at 2482. This is because "a warrant ensures that the inferences to support a search are 'drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.'" *Id.* (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)). "Warrantless searches by law enforcement officers 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Cervantes*, 703 F.3d 1135, 1138-39 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "Because warrantless searches . . . are *per se* unreasonable, the government bears the burden of showing that a warrantless search . . . falls within an exception to the Fourth Amendment's warrant requirement." *Id.* at 1141 (citing *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)); *accord United States v. Scott*, 705 F.3d 410, 416 (9th Cir. 2012). Under the exclusionary rule, evidence obtained in violation of an individual's Fourth Amendment rights, including any "'fruit of the poisonous tree,'" is excluded from a criminal trial. *Cervantes*, 703 F.3d at 1143; *see also Alderman*, 394 U.S. at 171 ("The exclusionary rule . . . excludes from a criminal trial any evidence seized from the defendant in violation of his Fourth Amendment rights. Fruits of such evidence are excluded as well." (citations omitted)).

In this case, the rangers did not obtain a warrant prior to searching the vehicle that William

and Charles Gearheart were in. Thus, the search is *per se* unreasonable and the government bears the burden of proving that the search falls within one of the "well-delineated exceptions" to the warrant requirement. *Cervantes*, 703 F.3d at 1139 (quoting *Katz*, 389 U.S. at 357) (internal quotation mark omitted). Presumably, the government intends to rely on the "automobile exception," as established in *Carroll v. United States*, 267 U.S. 132 (1925). Under the "automobile exception," a law enforcement officer may conduct a warrantless search of a "readily mobile" vehicle if "probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). Probable cause exists if "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

For three separate reasons, the rangers lacked probable cause to search the vehicle that Charles Gearheart occupied. First, Ranger Hesse exceeded the scope of the traffic stop's justifying purpose by digressing into questioning about weapons and drugs—which proximately caused William to admit he had a small amount of marijuana in the vehicle. Binding precedent is clear that such a digression, however short in duration, is an unreasonable extension of a traffic stop. Second, even if the Ranger Hesse lawfully obtained the probable cause to look for a small amount of marijuana, that probable cause was extinguished as soon as the rangers found paraphernalia that contained marijuana, moments into their search. Controlling precedent is clear that once the object of probable cause is found, law enforcement must stop their search, unless they have additional probable cause. Lastly, suspicion of marijuana possession is not a valid basis for probable cause in light of marijuana's effective decriminalization.

**A. The search was unconstitutional due to prolonging of the traffic stop.**

It is well established that law enforcement may not "extend a traffic stop with tasks unrelated to the traffic mission, absent independent reasonable suspicion." *United States. v. Willie Williams*, No. 22-10052, 2023 WL 5925893, *1 (9th Cir., Sep. 12, 2023) (unpublished) (quoting *United States v. Landeros*, 913 F.3d 862, 866 (9th Cir. 2019)). A "traffic mission" is "limited to addressing the traffic violation that warranted the stop and attending to safety related concerns." *Id.* (internal citations removed); *United States v. Evans*, 786 F.3d 779, 785 (9th Cir. 2015);

*Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Tasks not related to the traffic mission are "unlawful if they add time to the stop, and are not otherwise supported by independent reasonable suspicion of wrongdoing." *Landeros*, 913 F.3d at 866 (quoting *Rodriguez*, 575 U.S. at 357) (internal citations removed).

Applying this law, the Ninth Circuit further held that a traffic stop investigating the possibility of a stolen vehicle does not justify law enforcement asking "questions about consent to search a car and marijuana possession" because such a digression is "not sufficiently tailored to determining whether a car has been stolen." *Williams*, 2023 WL 5925893, at *2. The facts in this case are materially indistinguishable from *Williams*. In *Williams*, the officers initiated a stop "upon observing that the brake lights of Williams's car were not functioning." *Williams*, 2023 WL 5925893, *1. The government argued that the mission also included an investigation into whether the vehicle was stolen, as there was no registration information available during the initial records check. But, as the Ninth Circuit pointed out, "the officer's consent and marijuana inquiries came *after* the objective evidence revealed that Williams was the car's registered owner" because the officer had "reviewed Williams's registration card, which matched the car's license plate and listened Williams as the registered owner of the car." *Id*.

In this case, Ranger Hesse received a tip unrelated to drugs or weapons about a silver Lexus, and approached a parked silver Lexus and advised William that his registration was expired. It was reasonable for her to request license, registration, and insurance. Because William admitted to not having valid registration or insurance, Ranger Hesse asked him for "anything that links that you're the owner of this vehicle" and William immediately provided her a registration document that listed him as the owner. (*Ex. 1* at 2:03). The registration had expired on his birthday, December 21, 2022, which was two weeks prior. It was only *after* she had been provided this document—but before she even looked at it—that Hesse asked "any firearms, large knives, weapons in the vehicle?" and then "any marijuana in the vehicle?" In other words, within 2:16 of initiating the traffic stop—ostensibly for erratic driving and/or expired registration—Hesse had the driver of the vehicle's driver's license, photo ID, and documentation confirming ownership. This questioning prolonged the interaction by about a minute before she returned to her vehicle to call

1  dispatch. This in turn resulted in continued questioning and a complete search of the vehicle for
2  the better part of an hour.
3         At 3:42 minutes into the stop, before calling in the driver's license or any identifying
4  information about the vehicle, Ranger Hesse called dispatch to request backup for a vehicle search.
5  It was not until 4:06 minutes into the stop, almost two full minutes after having everything she
6  needed for her traffic mission, that Ranger Hesse read William's driver's license number to
7  dispatch. Then, upon learning that William's driver's license was expired at minute 5:32, Ranger
8  Hesse continued to delay the stop by discussing a search with two male rangers who appeared on
9  scene to assist her. She informed them that she wanted to "see if there is a valid driver in there."
10 But, upon returning to the vehicle, Ranger Hesse engaged in conversation with Mr. Gearheart for
11 over a minute inquiring about drugs in the vehicle (*Ex. 1* at 8:04 "we are gonna search the vehicle,
12 get all the drugs out of it, if it's just a little bit of marijuana, that's not that big of a deal, but if it's
13 anything harder, now's the time to kinda, speak up. Any LSD? . . .Mushrooms?"), before she
14 finally asked "Is there anybody that's a valid driver in this car?" (*Ex 1*. at 9:19). Mr. Gearheart
15 immediately responded that he was a valid driver, and he provided her his driver's license upon
16 request. It appears that by minute 11:40, Ranger Hesse was aware that Mr. Gearheart's license is
17 valid and that he could drive the party away from the scene. Regardless, Ranger Hesse instructed
18 a colleague to "take him out" of the vehicle and search him as she prepared to search the entire
19 vehicle for the next 42 minutes.
20        Just as in *Williams*, Ranger Hesse's "unrelated consent and marijuana inquires added time
21 to the stop." 2023 WL 5925893 at *2. The inquiry in *Williams* that the Ninth Circuit found
22 unconstitutional digression about marijuana and law enforcement's communication regarding
23 whether to proceed to search added "nearly three minutes to the stop." *Id*. Certainly if nearly three
24 additional minutes to a traffic stop is impermissible, the even longer time leading up to the search
25 in this case did, too. The entire mission of the traffic stop, including locating a suitable alternative
26 driver, was complete before the search of the vehicle began.
27        Ranger Hesse lacked any independent basis, other than William's answer, to establish
28 probable cause of marijuana possession. After two minutes of face-to-face interaction, Ranger

Hesse did not say or do anything to suggest that she had smelled marijuana in the vehicle. The question about marijuana appears to be part of the rangers' standard questioning, along with questions about firearms and large knives, that is unrelated to the mission of the underlying traffic stop. Later, when another ranger clarified with Ranger Hesse, "You smelled marijuana, you saw marijuana, or?" Ranger Hesse answered non-responsively: "they have marijuana in the car" rather than confirming that she either saw or smelled it independently of William's admission. (*Ex. 1* at 6:59).

Because the digression into drugs and marijuana was not justified by the reasonable suspicion that justified the underlying traffic stop, Officer Hesse violated the Fourth Amendment by prolonging the traffic stop—however briefly—to make her inquiry and obtain William's admission. *See Rodriguez,* 575 U.S. at 357; *United States v. Nault*, 41 F.4th 1073, 1077 (9th Cir. 2022) (a thirty-second delay unrelated to the original mission of the stop is an unreasonable seizure absent reasonable suspicion). The "exception to the warrant requirement established in *Carroll* . . . applies only to searches of vehicles that are supported by probable cause." *Holston v. U.S.*, 633 A.2d 378, 384 (D.C. Cir. 1993) (quoting *U.S. v. Ross*, 456 U.S. 798, 809 (1982)).

This Court should suppress all evidence obtained in violation of the Fourth Amendment as part of this warrantless vehicle search.

### B. The search was unconstitutional as an excessive automobile search after finding the suspected contraband.

The second problem with the search in this case is that the Rangers quickly found a water bong containing a small amount of marijuana—exactly what Ranger Hesse believed she had developed probable cause to find. Under binding precedent, this means that the rangers had to end their search, unless they had additional probable cause. Because there was no such independent probable cause, the evidence discovered in this case during the search that proceeded after the discovery of the bong must be suppressed.

The scope of the search permitted under the automobile exception is limited in that the officer may search only those areas of the automobile where there is probable cause to believe that the contraband or evidence will be found. *See California v. Acevedo*, 500 U.S. 565, 580 (1991)

("The facts in the record reveal that the police did not have probable cause to believe that contraband was hidden in any other part of the automobile and a search of the entire vehicle would have been without probable cause and unreasonable under the Fourth Amendment."); *see also United States v. Ross*, 456 U.S. 798, 824 (1982) ("The scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found."). The duration of the search is also limited—that is, the officer may search the automobile only until the contraband or evidence that the officer has probable cause to believe is in the vehicle is located. *See Horton v. California*, 496 U.S. 128, 141 (1990) (noting that if a warrant authorizes a search for specific items and such items are found "at the outset" or the defendant produces the items to the law enforcement officers, the search must then cease) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 517 (1971) (White, J., dissenting)); *see also Ross*, 456 U.S. at 825 (noting that a search conducted pursuant to the automobile exception can be "no broader and no narrower than a magistrate could legitimately authorize by warrant"). Once the contraband or evidence is found, an officer must terminate the search absent probable cause to believe that additional contraband or evidence will be found. *See Horton*, 496 U.S. at 141.

In this case, Ranger Hesse had probable cause to believe that there was a small amount of marijuana in the vehicle, as shown by William's admission to having a "little bit" (*Ex. 1* at 2:38) of marijuana. Ranger Hesse did not have probable cause to believe that there was additional contraband or evidence in the vehicle. The Ninth Circuit has been clear "that probable cause to believe that some incriminating evidence will be present at a particular place does not necessarily mean there is probable cause to believe that there will be more of the same." *United States v. Weber*, 923 F.2d 1338, 1344 (9th Cir. 1990). This is a well-established principle limiting intrusive searches. For example, in *United States v. Nora*, 765 F.3d 1049, 1051, 1059 (9th Cir. 2014), law enforcement officers obtained a search warrant to search a house for a firearm after they observed the defendant, who had two prior felon-in-possession convictions, carrying a firearm into the house and then leaving the house without the firearm. *Id.* at 1051. The search warrant authorized the officers to search for "firearms," rather than the single firearm the officers had observed the defendant carrying into the house. *Id.* The Ninth Circuit, citing *Weber*, concluded that the search

warrant was overbroad, as "the officers' firsthand observations of [the defendant] with a gun in his hand did not give them reasonable grounds to believe that any additional firearms would be found in the house." *Id.* at 1059.

Here, Ranger Hesse had probable cause to believe that William or Charles Gearheart possessed a small amount of marijuana within the vehicle. This alone did not give the officers probable cause to believe that there was additional marijuana—or other controlled substances or contraband—in the vehicle. There was no reason to believe that, if she asked, William or Charles Gearheart would not have told her exactly where, or given Ranger Hess what they had. Within the first ten second of the vehicle search, Hesse located a bong in the front passenger seat. (*Ex. 1* at 14:35). Still, multiple rangers spent over 42 minutes searching the passengers and every nook and cranny of the vehicle and its contents. Accordingly, the rangers exceeded the limits on both the scope and duration of the automobile exception by engaging in a general search of the vehicle. Accordingly, this Court should suppress the evidence found in violation of the Fourth Amendment as a result of this extended search.

### C. De facto federal decriminalization of marijuana negates probable cause for a search.

Lastly, apart from the prior constitutional infirmities, the evidence in this case must be suppressed because there was no probable cause to believe that any crime was committed relating to marijuana. It is notable that Ranger Hesse repeatedly advises that marijuana is "no big deal." (*Ex. 1* at 2:40, 8:26). Consistent with such an assurance, nobody was charged with possession any drug offense in this case. The reason for this stems from the October 2022 presidential proclamation that simple possession of marijuana offenses would be pardoned.[3] Since then, citations for simple possession of marijuana have been very rarely given, and even more rarely

---

[3] https://www.justice.gov/pardon/presidential-proclamation-marijuana-possession. While Mr. Gearheart acknowledges that this "full, unconditional, and categorical pardon for prior . . . offenses of simple possession of marijuana" does not prevent someone from being charged prospectively, there is a reason for that. An executive pardon is necessarily backward looking; one cannot pardon conduct that has not yet occurred. But it would defy logic to think that an offense that the President of the United States finds should be fully, unconditionally, and categorically pardoned should continue to be enforced or used to justify warrantless searches during otherwise routine traffic stops.

enforced throughout federal lands. Though marijuana remains federally illegal, due consideration should be given to the fact that the area surrounding the federal land where the Gearhearts found themselves—California—is a state where marijuana has been legal for over two-and-a-half decades medicinally and nearly seven years recreationally. (*See, generally* https://cannabis.ca.gov/cannabis-laws/laws-and-regulations/).

The widespread decriminalization of marijuana—and the recent push federally to reclassify it from a Schedule I drug[4]—call into question the reasoning of the cases that hold that marijuana provides reasonable suspicion for a warrantless vehicle search. The *Carroll* Doctrine was based on the idea that there was a difference "as to the necessity for a search warrant between [contraband] when concealed in a dwelling house or similar place, and like [contraband] in course of transportation and concealed in a moveable vessel where they readily could be put out of reach of a search warrant." *Carroll*, 267 U.S. at 151. The movability of the vehicle, such that it could carry away the potential contraband before a warrant could issue, being the crux of the issue. So, when the "contraband" at issue is a "little bit of marijuana," for which the Rangers would not have actually sought a warrant anyway, even if it had been in a home instead of a vehicle, the reason for the *Carroll* doctrine ceases to exist. The rangers would not, and did not, issue a citation for simple marijuana possession, and even if they had, the government likely would not have enforced it anyway. So, if the substance allegedly giving rise to "reasonable suspicion" that the "automobile . . . contains that which by law is subject to seizure and destruction" *Carroll* at 149, is not in fact treated as such, it cannot possibly give the rangers probable cause to search the entirety of the vehicle. This Court should therefore suppress all evidence obtained as a result of this unlawful warrantless search.

//

//

---

[4] https://thehill.com/policy/healthcare/4179304-hhs-sends-recommendation-to-dea-on-rescheduling-marijuana/ ("'In October 2022, President Biden requested that the HHS secretary and the attorney general conduct a review of how marijuana is currently scheduled under federal law . . . Following the data and science, HHS has expeditiously responded to President Biden's directive . . . and provided its scheduling recommendation for marijuana to the DEA on August 29, 2023,' an HHS spokesperson said.")

**III.    This Court must suppress all statements obtained in violation of Mr. Gearheart's Fifth Amendment Rights, as interpreted in *Miranda*.**

Regardless of the validity of the search, this Court must suppress Mr. Gearheart's statements made in response to various rangers' questioning because his statements were the fruit of a custodial interrogation and Mr. Gearheart was not provided *Miranda* warnings.

The government may not use a defendant's statements against him at trial "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Specifically, where a person is in custody and being questioned, any statement made to law enforcement is admissible only if the person was first advised of his right to remain silent, that any statement he does make may be used as evidence against him, that he has the right to the presence of an attorney, and that, if he is unable to afford to hire an attorney, an attorney will be appointed. *Id.*

"To determine whether an individual was in custody, a court must, after examining all of the circumstances surrounding the interrogation, decide 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)) (alteration in original). In other words, the court "must determine whether 'the officers established a setting from which a reasonable person would believe that he or she was not free to leave.'" *Id.* at 973-74 (quoting *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987)). In making this determination, courts consider various factors, including: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *Beraun-Panez*, 812 F.2d at 580 (citing *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir. 1985)).

Typically, "the roadside questioning of a motorist detained pursuant to a routine traffic stop [is not] considered 'custodial interrogation,'" as traffic stops are "temporary and brief," public, and usually involve only one or two law enforcement officers. *Berkemer v. McCarty*, 468 U.S. 420, 435, 437-39 (1984). Nevertheless, "[i]f a motorist who has been detained pursuant to a traffic

stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440.

In this case, what may have begun as a "routine traffic stop" that presumably was expected to be "temporary and brief," *Berkemer, supra*, escalated into a greater restraint on Mr. Gearheart's freedom of movement, such that he was entitled to the "full panoply of protections prescribed by *Miranda*." *Id.* at 435, 440. Unlike the typical traffic stop envisioned in *Berkemer*, the rangers removed the three adults and one child from the vehicle, and searched each of their person, and declined to let them leave for over 45 minutes while the vehicle was searched and citations were issued. Ranger Hesse was in possession of both Charles' and Williams' driver's licenses for the duration of the vehicle search.

Although none of the vehicle's occupants were handcuffed, the Rangers instructed them to stand, in the cold, along a fence on the side of the road for the duration of the vehicle search. After the first five minutes of the hour-and-four-minute-long encounter, there were three rangers present, and ultimately there were a total of five rangers present during the majority of the search and seizure. At least two or three of the rangers then stood watch over Mr. Gearheart and the others, who remained on the side of the road as instructed, while Ranger Hesse searched the vehicle. Under the circumstances, as soon as it became clear that the traffic stop would turn into a drug investigation beyond an initial inquiry into William's ownership of the Lexus, a reasonable person in the position of any of the occupants would have understood that he was not free to leave. (*See, e.g., United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("When a law enforcement official retains control of a person's identification papers . . . longer than necessary to ascertain that everything is in order, and initiates further inquiry while holding on to the needed papers, a reasonable person would not feel free to depart."). Thus, Mr. Gearheart was unquestionably "in custody" for purposes of *Miranda*—if not when he was advised by Ranger Hesse about 9 minutes into the encounter that the rangers were going to search the vehicle and that it "doesn't matter" that they do not consent—then at the latest at the 12-and-a-half-minute mark when he was ordered to exit the vehicle.

//

Because the rangers did not read Mr. Gearheart his *Miranda* rights, this Court must enter an order that all statements of Mr. Gearheart in response to any of the ranger's questions while he was in their custody are excluded from trial. Accordingly, this Court must exclude from trial all of Mr. Gearheart's un-*Mirandized* statements.

                                                  Respectfully submitted,

Dated:  September 25, 2023                 HEATHER E. WILLIAMS
                                                              Federal Defender

                                                              */s/  Kara R. Ottervanger*
                                                              KARA R. OTTERVANGER
                                                             Assistant Federal Defender
                                                             Attorney for Defendant
                                                             CHARLES GEARHEART