HEATHER E. WILLIAMS, Bar #122664
Federal Defender
KARA R. OTTERVANGER
Florida Bar No. 0112110
Assistant Federal Defender
2300 Tulare Street, Suite 330
Fresno, California 93721-2226
Telephone: (559) 487-5561
Kara_Ottervanger@fd.org

Counsel for Defendant
CHARLES GEARHEART

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>vs.<br><br>CHARLES GEARHEART,<br><br>*Defendant,* | Case No. 6:23-po-00079-HBK<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS CITATION UNDER THE SECOND AMENDMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: November 14, 2023<br>Time: 10:00 a.m.<br>Judge: Hon. Helena M. Barch-Kuchta |

**TO: PHILLIP TALBERT, UNITED STATES ATTORNEY; JEFFREY SPIVAK AND CHAN HEE CHU, ASSISTANT UNITED STATES ATTORNEYS; AND SEAN ANDERSON, YOSEMITE LEGAL OFFICER, COUNSEL FOR PLAINTIFF:**

**PLEASE TAKE NOTICE** that on November 14, 2023, or as soon thereafter as this matter can be heard, in the Eastern District of California, before the Honorable Magistrate Judge Helena Barch-Kutcha, defendant Charles Gearheart, through counsel Kara Ottervanger, will move this Court for an order dismissing the citation in this case.

This motion is made pursuant to the United States Constitution, including the Second Amendment; Federal Rule of Criminal Procedure Rule 12(b); Eastern District of California Local Rule 430.1; and all applicable statutes and case law.

//

//

1    This motion is supported by this Notice of Motion; the Memorandum of Points and

2    Authorities; the record of this case; and such argument and further law and evidence as may be

3    presented at the time of the hearing.

4                                                     Respectfully submitted,

5

6    Dated:  September 25, 2023              HEATHER E. WILLIAMS
                                             Federal Defender
7

8                                            */s/  Kara R. Ottervanger*
                                             KARA R. OTTERVANGER
9                                            Assistant Federal Defender
                                             Attorney for Defendant
10                                           CHARLES GEARHEART

## MEMORANDUM OF POINTS AND AUTHORITIES

The Supreme Court's recent opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), marked a dramatic shift in Second Amendment law. Before *Bruen*, courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts, instead, to consider only "constitutional text and history." 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen* "the Constitution presumptively protects that conduct." *Id.* at 2129-30. To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted.

Under the new framework mandated by *Bruen*, this Court should dismiss the citation against Defendant Charles Gearheart, which charges him with improper storage of a loaded firearm in a vehicle within the boundaries of Yosemite National Park under 36 C.F.R. § 2.4(g), incorporating California Penal Code 25610. Because possession of a loaded firearm comes within the Second Amendment's "plain text," Mr. Geartheart's conduct is presumptively protected. And the government will be unable to rebut that presumption. Bans on possessing loaded firearms within a vehicle on public land, even land that was home to government buildings, were alien to the generation that ratified the Second Amendment.

Therefore, the sole charge in this case must be dismissed.

### I.      Factual Background

On January 4, 2023, Mr. Gearheart was a passenger in a vehicle driven by his brother, William. William was stopped by Park Rangers for erratic driving, and upon learning that his license had just expired, the Rangers asked if anyone else was a valid driver. Mr. Gearheart advised that he was, and provided a valid license to the Rangers. Ultimately, after

William admitted to having marijuana in the vehicle, all the occupants were ordered removed and their persons and possessions were searched. It was at this time that the Rangers discovered that Mr. Gearheart had a loaded revolver in a fanny pack within the vehicle. Mr. Gearheart was cited with a violation of 36 CFR § 2.4 (g).

## II.    Legal Background

### a.    Before *Bruen*, lower courts assessed Second Amendment challenges by applying means-end scrutiny.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. 554 U.S. 570, 592, 624 (2008). The Court canvassed "the historical background of the Second Amendment," including English history from the 1600s through American independence, colonial law and practice leading up to and immediately following 1791, and evidence of how the Second Amendment was interpreted in the century after its enactment (e.g., legal treatises, pre-Civil War case law, post-Civil War legislation, and late-19th-century commentary). *Id.* at 592-619. Based on this survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." *Id.* at 586. Rather, "the Second Amendment confers an individual right to keep and bear arms" that "belongs to all Americans." *Id.* at 581, 622. The Court therefore struck down District of Columbia statutes that prohibited the possession of handguns in the home and required that any other guns in the home be kept inoperable. *Id.* at 628-34.

Two years after *Heller*, in *McDonald v. City of Chicago*, the Court reaffirmed *Heller*'s "central holding": that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." 561 U.S. 742, 780 (2010). In holding that the Second Amendment applies against the states as well as the federal government, the Court described the right to keep and bear arms as "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition."

*Id.* at 767. And that right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2126-27 & n.4. The first step "ask[ed] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *United States v. Chapman*, 666 F.3d 220, 225 (4th Cir. 2012). If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny." *Id.* Courts employed strict scrutiny if a challenger's claim implicated "the core right identified in *Heller*-the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." *Id.* at 225-26 (emphasis omitted). Otherwise, intermediate scrutiny applied. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

**b.  *Bruen* replaced means-end balancing with a test rooted solely in the Second Amendment's "text and history."**

The Supreme Court's recent opinion in *Bruen* disavowed the lower courts' framework, holding "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." 142 S. Ct. at 2127. In its place, the Court adopted a "text-and-history standard" more consistent with *Heller*'s methodology. *Id.* at 2138.

That standard directs courts to begin by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does, then "the Constitution presumptively protects that conduct." *Id.* Answering this threshold question in *Bruen* was straightforward. At issue there was a New York law providing that, to obtain a permit to carry a handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 2122-23.

1    The Court "ha[d] little difficulty concluding" that "the Second Amendment protects [the

2    petitioners'] proposed course of conduct—carrying handguns publicly for self-defense." *Id.*

3    at 2134. As the Court explained, "[n]othing in the Second Amendment's text draws a

4    home/public distinction with respect to the right to keep and bear arms." *Id.* The Second

5    Amendment therefore "presumptively guarantees" a right to carry firearms in public, and

6    New York's "proper cause" requirement, which burdened that right, could pass constitutional

7    muster only if the state overcame the presumption. *Id.* at 2129-30, 2135.

8         To rebut the presumption of unconstitutionality, *Bruen* held, "the government may

9    not simply posit that [a] regulation promotes an important interest." *Id.* at 2126. "Rather, the

10   government must demonstrate that the regulation is consistent with this Nation's historical

11   tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's

12   historical tradition may a court conclude that the individual's conduct falls outside the

13   Second Amendment's unqualified command." *Id.* This test requires courts to "consider

14   whether historical precedent . . . evinces a comparable tradition of regulation." *Id.* at 2131-

15   32. If "no such tradition" exists, then the statute being challenged is unconstitutional. *Id.* at

16   2132. And insofar as there are "multiple plausible interpretations" of an ambiguous historical

17   record, courts must "favor the one that is more consistent with the Second Amendment's

18   command." *Id.* at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant.

19   *See also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not

20   sufficiently probative to defend [a statute]").

21        The Court explained that "[c]onstitutional rights are enshrined with the scope they

22   were understood to have *when the people adopted them*." *Id.* at 2136 (emphasis in original).

23   For that reason, the relevant "historical tradition" for purposes of a federal gun regulation is

24   that which existed in 1791, when the Second Amendment was ratified. *Id.* at 2136.[1] Courts

25   may look to the tradition of firearms regulation "before . . . and even after the founding"

26   period, but they should do so with care. *Id.* at 2131-32. The Court cautioned, for example,

27

28   _____

[1] The Court reserved the question whether courts entertaining challenges to state statutes should examine history as of 1868, when the Fourteenth Amendment was adopted. *Id.* at 2137-38.

that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Nor should courts "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies." *Id.*

Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation." *Id.* But the farther forward in time one goes from 1791, the less probative historical evidence becomes. *See id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."). Evidence from "the mid- to late-19th-century" provides little "insight into the meaning of the Constitution in [1791]." *Id.* Courts should therefore credit such history to the extent it provides "confirmation" of prior practice with which it is consistent, but should otherwise afford it little weight. *Id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* ("[T]o the extent later history contradicts what the text says, the text controls.").

The Court in *Bruen* held that because New York could not point to a robust tradition of regulations similar to the "proper cause" requirement, the state's statute violated the Second Amendment. *Id.* at 2138-56. In reaching that conclusion, the Court did not elaborate a comprehensive scheme for evaluating historical evidence, but it did stake certain guideposts for lower courts to follow. The Court said, for instance, that "[i]n some cases," the historical inquiry "will be fairly straightforward":

//

//

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131; *see also id.* (explaining that if "the Founders themselves could have adopted" a particular regulation "to confront" "a perceived societal problem," but did not do so, then that regulation is unconstitutional today).

In "other cases," challenged statutes will "implicat[e] unprecedented societal concerns or dramatic technological changes," which "may require a more nuanced approach." *Id.* at 2132. When firearms pose "regulatory challenges" that are "not . . . the same as those that preoccupied the Founders in 1791," the "historical inquiry that courts must conduct will often involve reasoning by analogy." *Id.*; *see also id.* (directing courts to use "analogical reasoning" when confronting "present-day firearm regulations" that "were unimaginable at the founding"). Deciding "whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are relevantly similar." *Id.* The Court in *Bruen* declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but it did identify "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33. In other words, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are *central* considerations when engaging in an analogical inquiry." *Id.* at 2133 (emphasis in original).

The Court also stressed the limits of reasoning by analogy:

> To be clear, analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would

1   never have accepted. On the other hand, analogical reasoning requires only
2   that the government identify a well-established and representative
    historical *analogue*, not a historical *twin*. So even if a modern-day regulation
3   is not a dead ringer for historical precursors, it still may be analogous enough
    to pass constitutional muster.

4   *Id.* (emphasis in original).

5   Whether based on "distinctly similar" precursors or merely "historical analogues,"

6   the "comparable tradition of regulation" must be robust. *See id.* (requiring "a well-

7   established and representative" historical analogue); *id.* at 2137 (explaining that "a

8   governmental practice" can "guide [courts'] interpretation of an ambiguous constitutional

9   provision" *if* that practice "has been open, widespread, and unchallenged since the early days

10  of the Republic"). A handful of "outlier[]" statutes or cases from a small number of "outlier

11  jurisdictions" do not make out a historical tradition. *Id.* at 2153, 2156. The Court expressed

12  "doubt," for instance, that statutes from only three of the original thirteen colonies would be

13  sufficient to establish a relevant tradition. *Id.* at 2142. And in evaluating 19th-century "surety

14  laws" that New York argued were precursors to its "proper cause" requirement, the Court

15  discounted two of those ten laws—which were closest to New York's—as unrepresentative.

16  *See id.* at 2148 n.24. Moreover, even if certain statutes were widespread, courts should not

17  consider them determinative unless the historical record reveals the statutes were actually

18  enforced. *See id.* at 2149 (dismissing surety laws because "respondents offer little evidence

19  that authorities ever enforced [those] laws").

20  Finally, *Bruen* emphasized—repeatedly—that "the burden falls on [the government]

21  to show that [a statute] is consistent with this Nation's historical tradition of firearm

22  regulation." *Id.* at 2135. The "[g]overnment bears the burden" of "affirmatively prov[ing]

23  that its firearms regulation is part of the historical tradition that delimits the outer bounds of

24  the right to keep and bear arms." *Id.* at 2127, 2130; *see also, e.g.*, *id.* at 2141 n.11 ("But

25  again, because the Second Amendment's bare text covers petitioners' public carry, the

26  respondents here shoulder the burden of demonstrating that New York's proper-cause

27  requirement is consistent with the Second Amendment's text and historical scope."').

28  Consistent with "the principle of party presentation," courts are "entitled to decide a case

based on the historical record compiled by the parties." *Id.* at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150; *see also id.* at 2149 n.25 ("[T]he burden rests with the government to establish the relevant tradition of regulation.").

### III.  Argument

The regulation underlying Mr. Gearheart's citation, 36 C.F.R. § 2.4(g), makes it illegal to "carry[] or possess[] a weapon" in violation of "applicable" law. The applicable state law that Mr. Gearheart is charged with violating is California Penal Code (CPC) § 25610(a)(1), which requires that a firearm within a "motor vehicle" must be "locked in the vehicle's trunk or in a locked container in the vehicle." CPC § 25610, applied to federal lands via 36 C.F.R. § 2.4(g), violates Mr. Gearheart's Second Amendment rights to keep and bear arms. Under the Second Amendment's "plain text," a prohibition on possession loaded firearms in a vehicle, unless that firearm is locked and thus inaccessible for the duration of travel, is "presumptively" unconstitutional. *Bruen*, 142 S. Ct. at 2126. The government will be unable to rebut that presumption. There was no "historical tradition," as of 1791, of barring individuals from possessing loaded firearms in their vehicles unless those weapons were locked and unusable.

### A.  The Second Amendment presumptively protects Mr. Gearheart's right to carry a loaded firearm in his vehicle on National Park land without having to lock it up.

*Bruen* directs courts to begin the Second Amendment analysis by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id.* The answer to that question in Mr. Gearheart's case is yes. The Second Amendment secures the right of "the people" to "keep and bear arms." There can be no doubt that Mr. Gearheart is among "the people" whom the Second Amendment protects. *See Heller*, 554 U.S. at 580 (noting that "'the people' . . . unambiguously refers to *all* members of the political community, *not an unspecified subset*" (emphasis added)); *Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (emphasis added)). And a handgun, the type of firearm

/ /

1    Mr. Gearheart is charged with possessing, is the quintessential "arm" for Second Amendment

2    purposes. *Heller*, 554 U.S. at 628-39.

3        The right to "bear" arms "naturally encompasses public carry." 142 S. Ct. at 2134.

4    This meaning of "bear" is consistent with the "central component" of that right: "the Second

5    Amendment guarantees an individual right to possess and carry weapons in case of

6    confrontation, and confrontation can surely take place outside the home." *Id.* The Second

7    Amendment therefore extends to places outside the home, such as vehicles and roadways,

8    including those on National Park lands.

9        And, the Supreme Court has made clear that individual right to possess and use firearms

10   for lawful purposes like self-defense. *Heller,* 554 U.S. 570, 592, 624 (2008); *Chapman*, 666 F.3d

11   225-226 (applying strict-scrutiny to law's infringing upon a citizen's right to self-defense); *Bruen*,

12   142 S. Ct. at 2134 (the Second Amendment protects [the petitioners'] proposed course of

13   conduct—carrying handguns publicly for self-defense."). Self-defense includes a reasonable

14   access to the arms. A law that requires the firearm to either be unloaded or stored in a locked

15   compartment unconstitutionally restricts the ability to defend oneself by adding burdensome,

16   time consuming steps between perceiving a threat and being able to respond to it. The Ninth

17   Circuit has recognized that "without bullets, the right to bear arms would be meaningless."

18   *Jackson v. City of San Francisco*, 746 F.3d 953 (9th Cir. 2014) (abrogated on other grounds). Just

19   as a regulation "eliminating a person's ability to obtain or use ammunition could thereby make it

20   impossible to use firearms for their core purpose," *id.*, so too does a regulation requiring that a gun

21   loaded with ammunition must be locked away when in transport. In *Heller*, the Supreme Court

22   determined that the District of Columbia's requirement "that firearms in the home be rendered and

23   kept inoperable at all times" made it "impossible for citizens to use them for the core lawful

24   purpose of self-defense and [was] hence unconstitutional." 554 U.S. 630. Later, *Bruen* made clear

25   that "the Second Amendment guarantees an individual right to possess and carry weapons in case

26   of confrontation, and confrontation can surely take place outside the home." 142 S. Ct. 2134. If a

27   requirement that firearms *in the home* be inoperable is unconstitutional as an infringement upon

28   the core lawful purpose of self-defense in the event of a confrontation, then surely a similar

1  requirement that firearms *outside the home*—i.e. in a vehicle—be either inoperable or locked away

2  and thus inaccessible must also be an unconstitutional infringement upon the core lawful purpose

3  of self-defense.

4      **B.  The Government will be unable to rebut the presumption that CPC 25610 is**

5          **unconstitutional.**

6      Because "the Second Amendment's plain text covers [the defendant's] conduct, the

7  Constitution presumptively protects that conduct." *Id.* at 2126. To rebut the presumption, the

8  government must establish that CPC § 25610 "is consistent with this Nation's historical

9  tradition of firearm regulation." *Id.* And this duty to collect and present historic analogues

10  falls to the parties, not the court. *Baird v. Bonta*, No. 23-15016, 2023 WL 5763345, at *8

11  (9th Cir. Sept. 7, 2023). The government will be unable to do so. "Courts in our sister circuits

12  have consistently recognized that the *Bruen* standard for identifying a closely analogous

13  historical regulation is a demanding one." *Id.*

14      Although it is not entirely clear, the "general societal problem" to which CPC § 25610

15  is addressed, *id.* at 2131, to the extent that it involves a threat posed by having readily

16  accessible loaded arms during travel, then the problem is one "that has persisted since the

17  18th century." *Id.* There is nothing about the addition of a gas- or electric- powered motor to

18  the means of transportation that would set the "societal problem" apart from those that would

19  be present during travel by horse, carriage, ship, or steam train. Black's Law Dictionary

20  defines "vehicle" as "*n.* (17c) **1.** An instrument of transportation or conveyance. **2.** Any

21  conveyance used in transporting passengers or things by land, water, or air." VEHICLE,

22  Black's Law Dictionary (11th ed. 2019). Motor vehicle is defined as "(1890) A wheeled

23  conveyance that does not run on rails and is self-propelled, esp. one powered by an internal-

24  combustion engine, a battery or fuel-cell, or a combination of these." *Id.*

25      The government, therefore, can rebut the presumption of unconstitutionality only by

26  showing a historical tradition of regulations "distinctly similar" to CPC § 25610, which

27  forbids possessing readily accessible, loaded firearms in vehicles. *Id.* Mr. Gearheart is

28  unaware of a tradition of firearm regulations, circa 1791, that "broadly prohibit[ed]" carrying

readily accessible, loaded firearms within a vehicle. *Id.* at 2138. As a result, the government will be unable to overcome the presumption of unconstitutionality.

**IV.     Conclusion**

The statute under which Mr. Gearheart is charged, California Penal Code § 25610, applied to National Park land via 36 C.F.R. § 2.4(g), violates the Second Amendment as it was understood in 1791. The Court should therefore dismiss this case.

Respectfully submitted,

Dated:  September 25, 2023                HEATHER E. WILLIAMS
                                         Federal Defender


                                         */s/  Kara R. Ottervanger*
                                         KARA R. OTTERVANGER
                                         Assistant Federal Defender
                                         Attorney for Defendant
                                         CHARLES GEARHEART