UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 6:23-po-00079-HBK-1 |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO DISMISS[1] |
| v. | (Doc. No. 11) |
| CHARLES EDWARD GEARHEART, JR, | |
| Defendant | |

Pending before the Court is Defendant Charles Edward Gearheart Jr.'s ("Defendant" or "Gearheart") Motion to Dismiss Citation Under the Second Amendment. (Doc. No. 11, "Motion"). On January 4, 2023, Gearheart was issued a bailable[2] citation for violation of 36 C.F.R. § 2.4(g), carrying or possessing a weapon, trap or net in violation of applicable Federal and State laws, specifically California Penal Code § 25610,[3] stemming from an incident that

---

[1] This matter is assigned to the undersigned consistent with Local Rule 302(b)(3).

[2] In lieu of appearance, Gearheart had the option to pay a $250 fine and $30 processing fee to the Central Violation Bureau. (Doc. No. 1 at 1).

[3] Cal. Penal Code § 25610 provides: "(a) Section 25400 shall not be construed to prohibit any citizen of the United States over the age of 18 years who resides or is temporarily within this state, and who is not prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, from transporting or carrying any pistol, revolver, or other firearm capable of being concealed upon the person, provided that the following applies to the firearm: (1) The firearm is within a motor vehicle and it is locked in the vehicle's trunk or in a locked container in the vehicle. (2) The firearm is carried by the person directly to or from any motor vehicle for any lawful purpose and, while carrying the firearm, the firearm is contained within a locked container."

occurred on Northside Drive near Superintendent Straight in Yosemite National Park. (*See* Doc. No. 1, "Citation"). Represented by the Federal Public Defender, Gearhart seeks dismissal of the Citation on the grounds that the regulation violates the Second Amendment. (*See generally* Doc. No. 11). The Government filed an Opposition (Doc. No. 13)[4] and Gearheart filed a Reply (Doc. No. 16). On January 12, 2024, the Court heard oral argument on the Motion. The Court denies the Motion.

**BACKGROUND**

The facts in this case are limited to those set forth in the probable cause statement in support of the Citation. While on patrol at 1230 hours on January 4, 2023, Yosemite National Park Ranger S. Hesse observed a Lexus GS with California plates displaying expired registration. (Doc. No. 1 at 3). Ranger Hesse effected a traffic stop and asked the driver if there were any large knives, firearms, or weapons in the vehicle. (*Id.*). Hesse noted a strong odor of burnt marijuana emitting from the vehicle. (*Id.*). Due to the smell, Ranger Hesse called for additional units before conducting a search of the vehicle. (*Id.*). One of the additional Rangers who reported to the scene ordered the driver and two adult passengers, including an individual later identified as Defendant Gearheart, to exit the vehicle. (*Id.*). As Defendant was preparing to exit the vehicle, Rangers instructed him to leave a green fanny pack he was carrying inside the vehicle. (*Id.*). During the vehicle search, Rangers found a loaded .38 special LCR Ruger revolver in Defendant's fanny pack. (*Id.*). Gearheart "did not provide a carry conceal permit for his firearm." (*Id.*).

Gearheart argues that under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022) ("*Bruen*"), 36 C.F.R. § 2.4(g) no longer survives constitutional scrutiny. (*See generally* Doc. No. 11). In *Bruen*, the Supreme Court replaced the means-end balancing test with a new two-step framework in analyzing the constitutionality of a firearm regulation. The court

---

[4] As discussed further below, the Government asserts that the probable cause statement prepared by the Rangers in support of the Citation incorrectly cited the incorporated state law being violated as Cal. Penal Code § 25610 which is an exemption to Cal. Penal Code § 25400, rather than to § 25400 itself. The Government noted its intent to file an information to clarify the underlying violation of state law. (Doc. No. 13 at 2, n. 2). As of the date of this Order, the Government has not filed an information.

first must determine whether "the Second Amendment's plain text covers [the] individual's conduct." *Bruen*, 597 U.S. at 24. If so, "the Constitution presumptively protects that conduct." *Id.* To rebut the presumption, the government must show that the challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id.* A firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era when the Second Amendment was adopted. *Id.*

The regulation with which Gearheart is charged, 36 C.F.R. § 2.4(g), prohibits "[t]he carrying or possessing of a weapon, trap or net in violation of applicable Federal and State laws[.]" Notably, section 2.4(g) is modified by § 2.4(a), which states:

> (a) None of the provisions in this section or any regulation in this chapter may be enforced to prohibit an individual from possessing a firearm, including an assembled or functional firearm, in any National Park System unit if:
>
> (1) The individual is not otherwise prohibited by law from possessing the firearm; and
>
> (2) The possession of the firearm is in compliance with the law of the State in which the National Park System unit is located.

36 C.F.R. § 2.4(a). In effect, so long as an individual carrying or possessing a firearm within a motor vehicle within a national park does so in compliance with applicable state and federal law, there is no § 2.4(g) violation. The Government argues, therefore, that so long as the state law(s) with which Gearheart failed to comply are constitutional, § 2.4(g) also passes constitutional muster. (Doc. No. 13 at 2-3).

The Government asserts in the instant case there are two California state laws relevant for consideration of whether Gearheart was "in compliance with the law of the State in which the National Park System unit is located." These are Cal. Penal Code § 25400, which generally makes it a crime in California to carry a concealed firearm absent one of more than two dozen enumerated exemptions, and Cal. Penal Code § 25655, which provides such an exemption for those in possession of a California public carry license issued pursuant to Cal. Penal Code

3

§ 26150 et seq.[5] The Government contends that Gearheart's January 4, 2023 citation was based not only on the improper storage of the firearm but on Gearheart's failure to "provide a carry conceal permit for his firearm" which would have provided an exemption to enforcement of § 2.4(g).[6]

Under the state laws cited above, a person carrying or possessing a firearm while holding a California public carry license is "in compliance with the law of the State in which" Yosemite National Park is located, namely Cal. Penal Code § 25400, and thus exempt from a violation of § 2.4(g), pursuant to the operation of § 2.4(a)(2).[7] The Government therefore argues that so long as California's public carry licensing framework is constitutional under *Bruen*, § 2.4(g) is also constitutional.[8] Relying on the Supreme Court's discussion of licensing schemes and the historical limitations on concealed carry in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008) ("*Heller*"), as well as California Court of Appeal decisions finding the now-invalid "good cause" provision of California's licensing scheme severable, the Government reasons that California's public carry licensing scheme is constitutional. (Doc. No. 13 at 4-8). Alternatively, the Government asserts that 36 C.F.R. § 2.4(g) is lawful as an exercise of the federal government's power under the Property Clause of the Constitution (*id*. at 8-10), and that the regulations are proper because National Parks are "sensitive places" where firearms may be restricted (*id*. at 10-12).

In his Reply, Gearheart first contends that because the January 4, 2023 citation is based on

---

[5] Depending on the applicant's county of residence, Cal. Penal Code § 26150 provides for the issuance of either a concealed carry license, which is available in any California county, or an open carry license, available only in those counties with a population of less than 200,000 by the most recent federal census. *See* Cal. Penal Code 26150(b)(1), 26155(b)(1). *See also Baird v. Bonta*, --- F.Supp.3d ----2023 WL 9050959 (E.D. Cal. Dec. 29, 2023). Under the plain language of Cal. Penal Code § 25655, an individual possessing either a concealed carry or open carry license would be exempt from Cal. Penal Code § 25400. The eligibility requirements for both licenses are identical. *See* Cal. Penal Code 26150(a)(1)-(4).

[6] The California Penal Code sets forth more than two dozen other exemptions to application of Cal. Penal Code § 25400.  *See* Cal. Penal Code §§ 25505-25655.

[7] The Court does not opine on the constitutionality of Cal. Penal Code § 25610 as applied to an individual visiting Yosemite National Park from another state who otherwise is in possession of a firearm as authorized under that state's law.

[8] As discussed *infra*, the Court does not fully adopt the Government's premise, but agrees that the basic parameters of California's public carry licensing scheme are relevant to the constitutionality of 36 C.F.R. § 2.4(g).

4

a violation of an *exemption* to § 25400, "it has failed to charge Mr. Gearheart with an actual crime[,]" thus warranting dismissal under Rule 12(b)(3)(B)(v). (Doc. No. 16 at 6). Further, he argues that the Government "discuss[es] the constitutionality of a California statute under which Mr. Gearheart has not been charged" and then "fails to examine whether the criteria in California's licensing scheme actually satisfies [sic] *Bruen*." (*Id*. at 6-7). Gearheart contends that the Government must articulate a "'text-and-history' analysis . . . demonstrat[ing] a historical basis for each requirement of the licensing scheme." (*Id*. at 7). Additionally, Gearheart contends that the Property Clause of the Constitution does not authorize the federal government to infringe on individual rights within federal lands and argues that National Parks are not "sensitive places." (*Id*. at 9-21).

## APPLICABLE LAW AND ANALYSIS

### A. Legal Standard

Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, a "party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Rule 12(b)(3) specifies which motions must be made before trial and includes a motion to dismiss for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(v). A motion to dismiss is generally capable of determination if it "involves questions of law rather than fact." *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017). Defendant's Motion claiming that 36 C.F.R. § 2.4(c) is unconstitutional is a jurisdictional challenge and falls within Fed. R. Crim. P. 12(b)(3)(B)(v). *See United States v. Montilla*, 870 F.2d 549, 552 (9th Cir. 1989), *opinion amended*, 907 F.2d 115 (9th Cir. 1990) (jurisdictional claim permitted under Rule 12(b) include allegations that the appliable statute is unconstitutional); *see also United States v. Nassif*, 628 F. Supp. 3d 169, 177 (D.D.C. 2022) (charging document fails to state a claim if the charged provision is unconstitutional or otherwise does not apply to defendant's conduct).

In ruling on a pretrial motion to dismiss, "the district court is bound by the four corners of the [charging document]." *United States v. Lyle*, 742 F.3d 434, 436 (9th Cir. 2014); *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). The court "cannot consider evidence that does not appear on the face of the [charging document]." *Kelly*, 874 F.3d at 1046 (citing *Lyle*, 742 F.3d at

5

436; *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996)).

**B. Standing**

Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies." *See, e.g., Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013). As the Supreme Court has observed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted). The party invoking federal jurisdiction has the burden of establishing constitutional standing. *Clapper*, 568 U.S. at 411-12; *see also Bond v. United States*, 564 U.S. 211 (2011) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). To establish Article III standing, a party must show an injury that is "(1) concrete, particularized, and actual or imminent; (2) fairly traceable to the challenged action; and (3) redressable by a favorable ruling." *Clapper*, 568 U.S. at 409 (internal quotation marks omitted). "[This] irreducible constitutional minimum" requires that the party suffer "an invasion of a legally protected interest . . ." *Lujan*, 504 U.S. at 560.

Because the Government charged Gearheart with a violation of 36 C.F.R. § 2.4(g), and because he is subject to a constitutional injury if convicted under a potentially invalid law, the Court concludes that he has standing to challenge the constitutionality of § 2.4(g). (*See Bond*, 564 U.S. at 226 ("Bond, like any other defendant, has a personal right not to be convicted under a constitutionally invalid law.") (Ginsburg and Breyer, J., concurring). Significant, however, Gearheart does not allege that he attempted to follow California's public carry law, nor does he even discuss the public carry scheme in his moving brief. Because Gearheart does not submit any competent evidence to the effect that he applied for a license or that such an application would have been futile[9], he lacks standing to raise a Second Amendment challenge to Cal. Penal Code

---

[9] At oral argument, Gearheart's counsel represented that Gearheart did not apply for a public carry license because he lacked an established residential address in California, a requirement of the application. However, without an affidavit or other sworn statement by Gearheart attesting to the facts regarding his inability to obtain a public carry license or the futility of him applying for one, Gearheart fails to establish the constitutional minimum for Article III standing. *See Lujan*, 504 U.S. at 560; *see also Antonyuk*, 89 F.4th at 308.

6

§ 26150 et seq. (*See State v. Wilson*, —— P.3d ——, 2024 WL 466105, at *2 (Haw. Feb. 7, 2024) ("Wilson illegally possessed a handgun because he never tried to follow Hawaii's firearm registration and license to carry law.  Because he didn't apply for a permit, he lacks standing to raise a Second Amendment challenge."); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 308 (2d Cir. 2023) (finding plaintiff had standing to challenge N.Y. state public carry licensing regime despite never having formally applied, where he stated, in affidavit, reasons he was deterred by various requirements of the application process).  Accordingly, while the Court must examine California's public carry licensing scheme, it need not analyze a facial challenge to the California law and determine whether it survives constitutional scrutiny under *Bruen*.  The limited question before the Court is whether 36 C.F.R. § 2.4(g), as applied on federal lands in California in combination with relevant state law exemptions, violates the Second Amendment.

**C. Discussion**

    1. <u>Defendant Raises a Limited Facial Challenge to 36 C.F.R. § 2.4(g)</u>

"[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated . . ." *Bucklew v. Precythe*, 587 U.S. ——, 139 S. Ct. 1112, 1127 (2019).  To mount a successful facial challenge, the plaintiff "must 'establish that no set of circumstances exists under which the [law] would be valid,' or show that the law lacks 'a plainly legitimate sweep.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. ——, 141 S. Ct. 2373, 2387 (2021) (alteration in original) (first quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987); then quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)).  In other words, "[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications." *Bucklew*, 139 S. Ct. at 1127; accord *Cmty. Hous. Improvement Program v. City of New York*, 59 F.4th 540, 548 (2d Cir. 2023). For this reason, facial challenges are "the most difficult to mount successfully." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (alteration adopted and quotation omitted).

    The precise nature of Gearheart's legal challenge to 36 C.F.R. § 2.4(g) is unclear from the Parties' briefing.  The Government describes Plaintiff's claim as a facial challenge, (Doc. No. 13 at 4), while Gearheart's briefing does not address whether his challenge is facial or as-applied.

(*See* Doc. Nos. 11, 16). At oral argument, the Parties ultimately appeared to agree that Gearheart asserted a challenge that was neither strictly as applied nor facial, but somewhere in between. As in a facial challenge, Gearheart's burden is to demonstrate that no application of 36 C.F.R. § 2.4(g) to the subset of potential cases he identifies (enforcement actions in California involving state-law exemptions) could be constitutional. The Court finds that Gearheart fails to carry that burden.

> 2. Title 36 C.F.R. § 2.4(g) is Consistent with the Nation's Historic Tradition of Firearm Regulation

At the outset, the Court disagrees with Gearheart that the reference to § 25610 in Ranger Hesse's probable cause statement renders the Citation legally defective. The Citation properly cites the regulation which he is charged with violating—36 C.F.R. § 2.4(g). Furthermore, the probable cause statement cited to Gearheart's failure to "provide a carry conceal permit for his firearm" as well as for his "improper storage of a firearm in a vehicle," both of which provide predicate state law violations for a § 2.4(g) violation and gave notice to Gearheart of the charges against which he must defend. *See Hamling v. United States*, 418 U.S. 87, 117 (1974) (noting indictment sufficient if it contains elements of offense and fairly informs defendant of charges and provides him with a double jeopardy defense against future prosecution). Consequently, dismissal of the Citation as facially or legally defective is denied.

The Court next turns to the Second Amendment analysis. *Bruen* now controls the review of any firearm-related regulation, and therefore to the extent that Gearheart challenges federal and state gun laws, they must survive scrutiny under *Bruen* and related precedent. As noted above, Gearheart's challenge is to the constitutionality of 36 C.F.R. § 2.4(g) as applied to prosecutions in California-situated federal lands involving state-law exemptions pursuant to 36 C.F.R. § 2.4(a)(2).

Looking to the first analytical step in *Bruen*, the Court agrees that the Second Amendment covers the conduct regulated by both 36 C.F.R. § 2.4 and Cal. Penal Code §§ 25400/25655; they both regulate the "individual right to armed self-defense" by controlling the ability to possess or carry firearms in a national park. *See Bruen*, 597 U.S. at 27. The ability to possess or carry

firearms necessarily implicates the right to keep and bear arms for self-defense.  Thus, the burden shifts to the Government to point to analogues demonstrating that similar regulations were widespread in the Founding era.

Gearheart points out, correctly, that the Government does not cite examples of specific historical regulations mirroring the elements of § 2.4(g) or the California statutes the Government contends Gearheat violated. (Doc. No. 16 at 1-8).  Defendant thus argues the Government has failed to carry its burden under *Bruen*.  While the Government does not engage in detailed historical analysis, the Court finds, based on its own review and the Government's briefing, that § 2.4(g) and § 25400 in combination with applicable exemptions are consistent with the Nation's historic tradition of firearm regulation.

While Gearheart characterizes 36 C.F.R. § 2.4(g) as a "*ban* [] on possessing loaded firearms within a vehicle on public land," a regulation that was "alien to the generation that ratified the Second Amendment," this is not quite accurate. (Doc. No. 11 at 3) (emphasis added). To describe the federal law as a "ban" ignores the significant carveout set forth in § 2.4(a) and related state laws.  Read together, 36 C.F.R. §§ 2.4(a) and 2.4(g) provide that any individual possessing or carrying a firearm within a national park *must do so in compliance with applicable state and federal laws*.  California's concealed carry law, Cal. Penal Code § 25400, generally prohibits individuals from carrying a concealed firearm, subject to more than two dozen enumerated exceptions (beyond those for law enforcement and military personnel), including for individuals holding a California public carry license.  *See* Cal. Penal Code §§ 25505-25655. Accurately characterizing the law is not merely an academic matter but guides the Court in determining whether the law fits within the Nation's historic tradition of firearm regulation.

As the Supreme Court noted in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right [to bear arms] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. Indeed, the Supreme Court in *Bruen* observed that, "Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or

the exceptional circumstances under which one could not carry arms." 597 U.S. at 38.

While finding the heightened "good cause" requirement in New York's public carry licensing scheme unconstitutional, the Court made clear that, "nothing in our analysis should be interpreted to suggest the unconstitutionality of . . . 'shall-issue' licensing regimes . . . which often require applicants to undergo a background check or pass a firearms safety course [and] are designed to ensure that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at 38; *see also Antonyuk v. Chiumento*, 89 F.4th 271, 312 (2d Cir. 2023) ("Licensing that includes discretion that is bounded by defined standards, we conclude, is part of this nation's history and tradition of firearm regulation and therefore in compliance with the Second Amendment."). Thus, while the Supreme Court found in *Bruen* no American "tradition of broadly *prohibiting* the public carry of commonly used firearms" "well-defined *restrictions*" on the right to carry firearms in public remain constitutional. 597 U.S. at 38. (emphasis added).

Indeed, looking to regulations in effect during the relevant historical periods confirms this.[10] The right to keep and bear arms is applicable to the States through the Fourteenth Amendment, *see McDonald v City of Chicago*, 561 U.S. 742, 750 (2010), which was adopted in 1868. Noting this fact in *Bruen*, the Supreme Court expressly declined to decide "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" and observed that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* at 38.

Because Gearheart's challenge is to both federal and state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both relevant to the Court's analysis. *See Bruen,* 597 U.S. at 4 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." (quoting *Heller*, 554 U.S. at 634–35)); *McDonald*, 561 U.S. at 778 (plurality opinion) ("[I]t is clear that the Framers and ratifiers of the

---

[10] "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates or postdates either time may not illuminate the scope of the right." *Bruen*, 597 U.S. at 4.

1  Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights
2  necessary to our system of ordered liberty.").

3        This is consistent with the decisions of other federal courts finding "the understanding that
4  prevailed when the States adopted the Fourteenth Amendment" is, along with the understanding
5  of that right held by the founders in 1791, a relevant consideration. *Nat'l Rifle Ass'n v. Bondi*, 61
6  F.4th 1317, 1322 (11th Cir. 2023); *see also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96,
7  112 (3d Cir. 2023) (en banc) (Ambro, J., concurring) (observing that if the relevant period
8  extends beyond the Founding era, "then Founding-era regulations remain instructive unless
9  contradicted by something specific in the Reconstruction-era"); *Drummond v. Robinson Twp.*, 9
10 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and Fourteenth Amendments'
11 ratifiers approved regulations barring training with common weapons in areas where firearms
12 practice was otherwise permitted."); *Ezell v. City of Chicago*, 651 F.3d 684, 702, 705–06 (7th Cir.
13 2011) (explaining that a "wider historical lens" is required for a local—or state—regulation, and
14 considering evidence from both the Founding-era and Reconstruction).

15       *Supra*, 36 C.F.R. § 2.4(g) requires that an individual carrying or possessing a firearm in a
16 national park do so in compliance with state and federal laws, including any applicable
17 exemptions. In effect, California—and by extension § 2.4(g)—conditions carrying or possessing
18 a loaded firearm in a vehicle in Yosemite, at least as to California residents, on possession of a
19 California public carry license. As determined by one scholar after conducting a broad review of
20 historical firearm regulations, similar laws "requiring a physical license or permit to carry
21 concealed and dangerous weapons" in public date at least to the 1860s and in fact "appear to have
22 originated in California." *See* Brief of Amicus Curiae Patrick J. Charles in Support of Neither
23 Party, App'x 1, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) (No. 20-843)
24 (hereinafter, "Charles Amicus Br."). The Court finds the following history instructive:

25       After the state of California repealed its law prohibiting the
26       carrying of concealed weapons except for "travelers . . . actually
      engaged in making a journey at the time," S , P , 1863, at 748
27       (1863); S , P , 1869-70, at 67 (1870), local California jurisdictions
      began enacting similarly worded ordinances with the notable
28       difference of granting local government officials discretion to issue
      armed carriage licenses "to any peaceable person, whose profession

> may require him to be out at late hours of the night." Ordinance No. 84: Prohibiting the Carrying of Concealed Deadly Weapons, Apr. 24, 1876, C 173 (1896). These licensing or permitting laws quickly spread across California, including in such cities as San Francisco, Santa Barbara, and Fresno to name a few. 4 App. I.A. at 2-12. And in 1891 the California Supreme Court upheld such a law against a state constitutional challenge, albeit not on Second Amendment grounds. *Ex Parte Cheney*, 90 Cal. 617, 621 (1891) ("It is a well-recognized fact that the unrestricted habit of carrying concealed weapons is the source of much crime, and frequently leads to causeless homicides, as well as to breaches of the peace, that would not otherwise occur.").

Charles Amicus Br. at 10. As one of many examples from the Reconstruction era, an 1892 ordinance in the City of Monterey stated that:

> Every person not being a peace officer, who shall, within the corporate limits of the City of Monterey, carry or wear any dirk, pistol, sword in cane, slung-shot or other dangerous or deadly weapon concealed, except by special permission in writing from the President of the Board of Trustees of said City, shall, upon conviction thereof before any Court of competent jurisdiction be deemed guilty of a misdemeanor . . .

App. 11 to Charles Amicus Br. Indeed, similar laws regulating public carry spread to states and municipalities throughout the nation in the decades surrounding the ratification of the Fourteenth Amendment: Kansas; Milwaukee, Wisconsin; Lincoln, Nebraska; St. Paul, Minnesota; New Haven, Connecticut; and Wheeling, West Virginia, to name a few. Charles Amicus Br. at 11-12.

While not identical, 36 C.F.R. § 2.4(g) and Cal. Penal Code §§ 25400/25655 are fundamentally like these Reconstruction-era firearm regulations. The state law probits concealed carry of a firearm absent an exemption, such as possession of a California public carry license. The federal regulation essentially borrows applicable state law, and thus conditions possessing or carrying a firearm inside a vehicle in a national park on compliance with state law. The 19th century precursors likewise criminalize carrying a concealed weapon in a particular city, county, or state without a license to do so. The purpose of both the 19th century and modern statutes is the same—to ensure that those who carry firearms in public are responsible, law-abiding citizens.

In the case of California's public carry licensing scheme, this includes ensuring the applicant is not disqualified on account of factors such as (1) being a danger to oneself or others; (2) being subject to a restraining order or protective order; (3) having been convicted in the

12

preceding 10 years of certain serious offenses; (4) having "engaged in an unlawful and reckless use, display, or brandishing of a firearm"; and (5) having been incarcerated or released on probation or parole in the preceding five years following conviction for "an offense, an element of which involves controlled substances." *See* Cal. Penal Code § 26202 (setting forth disqualifying factors for those applying for a public carry license). Similarly, New York's 1878 concealed-carry ordinance explicitly cited the concern that the disorderly and the intoxicated were going about carrying pistols, "insult[ing] respectable citizens, and draw[ing] a pistol on any and every occasion, while the better and law-abiding class try to obey the laws and protect themselves with nothing but nature's weapons." *Antonyuk*, 89 F.4th at 322 (citing New York, N.Y., An Ordinance to Regulate the Carrying of Pistols in the City of New York, committee report) ("As to the necessity for the passage of the ordinance there can be no question. The reckless use of firearms by the dangerous classes in this city is proverbial, and this measure of repression seems to be necessary.").

Historians appear to agree that licensing schemes were a post-Civil War phenomenon, largely due to the development of urban centers, professional police forces, and administrative agencies. *See, e.g.*, Brief of Amici Curiae Profs. of Hist. & L. in Supp. of Resps. at 22, *N.Y. State Rifle and Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("In the latter half of the nineteenth century, many municipalities also began to enact licensing schemes, pursuant to which individuals had to obtain permission to carry dangerous weapons in public."); Charles Amicus Br. at 7–9; Saul Cornell, "History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?", 49 HASTINGS CONST. L.Q. 145, 168–71 (2022). Thus, the historical record does not yield examples of public carry licensing in the Founding Era. However, as the Supreme Court acknowledged in *Bruen*, "the regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868" and thus "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. The mid-to-late 19th century saw "technological advancements in

both firearms and travel" that introduced regulatory challenges unknown to the Founders[11] but that are familiar to us today—mass transportation, dense urban centers, national parks seeing millions of annual visitors. While the regulatory solutions introduced during Reconstruction differed in kind from those of the Founding Era, they reflected the common desire to ensure that "those bearing arms in [a] jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38. Thus, the license-based regulation on public carry of firearms set forth in § 2.4(g) and § 25400/26150 are both consistent with the Nation's historic tradition of firearm regulations designed to protect order and public safety.

      Gearheart seeks to attack the constitutionality of 36 C.F.R. § 2.4(g) and Cal. Penal Code § 25400 indirectly by arguing that California's public carry licensing scheme, which offers an exemption to both laws, is itself unconstitutional. However, the Court need not analyze a facial challenge to California's public carry licensing scheme under *Bruen* because, as noted above, Gearheart has not established standing to challenge that law, nor has he identified any provision of the multi-part statutory scheme that he contends is unconstitutional. To shift the burden to the Government to justify the constitutionality of a law, a criminal defendant must first demonstrate an actual or imminent injury he faces from the law and demonstrate that a favorable judicial decision would likely redress the injury; Gearheart has failed to do so. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("To establish Article III standing, a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"). At best, Gearheart appears to challenge the very fact that he would be required to hold a public carry permit to legally carry or possess a loaded firearm in his vehicle. Nothing in *Bruen* suggests that a firearm licensing scheme, as a general matter, is per se unconstitutional, and indeed the Court explicitly rejected such an interpretation. *See Bruen*, 597 U.S. at 38, n. 9; at 79 ("the Court's decision does not prohibit States from imposing licensing requirements") (Kavanaugh concurrence). Further,

---

[11] Patrick J. Charles, "The Second Amendment and the Basic Right to Transport Firearms for Lawful Purposes," 13 Charleston L. Rev. 125, 148 (2018)

1   California's public carry scheme, as modified by the California Attorney General's

2   Memorandum, has survived one constitutional challenge under *Bruen*. *See Baird*, 2023 WL

3   9050959 (noting that the Attorney General's instruction "mooted any dispute about California's

4   former 'good cause' law) (citing *Flanagan v. Bonta*, 2023 WL 1771160 (9th Cir. Feb. 1, 2023)

5   (dismissing a challenge to the "good cause" requirement as moot).

6       Accordingly, because the Court concludes both 36 C.F.R. § 2.4(g), as modified by

7   § 2.4(a), and Cal. Penal Code § 25400, as modified by § 25655, are consistent with this Nation's

8   historic tradition of firearm regulation, Defendant fails in his limited facial challenge asserting

9   that every application of these laws on California federal lands is unconstitutional.

10       3.   <u>The Property Clause and Sensitive Places Doctrine Do Not Alter the Analysis</u>

11       The Government asserts that an additional reason to deny Plaintiff's Motion is because the

12   Property Clause of the Constitution provides Congress the power to "make all needful Rules and

13   Regulations respecting the Territory or other Property belonging to the United States." U.S.

14   Const., art. IV, § 3, cl. 2. This includes regulations over federal property enacted to "control their

15   occupancy and use, to protect them from trespass and injury, and to prescribe the conditions upon

16   which others may obtain rights in them . . ." *Utah Power & Light Co. v. United States*, 243 U.S.

17   389, 405 (1917).

18       In one Fourth Circuit case, the court upheld a separate (and now-superseded) provision of

19   36 C.F.R. § 2.4 against constitutional challenge, relying on part on the Property clause. *See U.S.*

20   *v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011), abrogated by *Bruen*, 597 U.S. 1. However,

21   the court's Property clause analysis was intertwined with a pre-*Bruen* analysis finding that "the

22   government has a substantial interest in providing for the safety of individuals who visit and make

23   use of the national parks." *Id.* Thus, the Court disagrees with the Government's position that the

24   *Masciandaro* court's Property Clause reasoning can be divorced from the Fourth Circuit's now

25   disavowed means-ends analysis.

26       Moreover, federal statutes enacted pursuant to the police power vested in Congress by the

27   Property Clause remain subject to constitutional scrutiny. *See, e.g., Metro. Washington Airports*

28   *Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 253 (1991) ("Nor is there

merit to petitioners' contention that the Board should nevertheless be immune from scrutiny from constitutional defects because it was created in the course of Congress' exercise of its power to dispose of federal property under Article IV, § 3, cl. 2."). Thus, 36 C.F.R. § 2.4(c), even if justified pursuant to Congress' police powers under the Property Clause, must survive the scrutiny prescribed in *Bruen*.

The Court likewise does not find the so-called "sensitive places" doctrine alters the analysis here. In *Bruen*, the Court affirmed the recognition in *Heller* that "States may forbid public carriage in 'sensitive places'" such as "legislative assemblies, polling places, and courthouses." 597 U.S. at 30. It also noted that "courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Id*. However, it specifically declined to adopt the position that sensitive places are anywhere "people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." *Id*. at 30-31.

The lower court in *Masciandaro*, upholding another provision of 36 C.F.R. § 2.4, held that:

> National Parks are public properties where large numbers of people, often strangers (and including children), congregate for recreational, educational, and expressive activities. Moreover, the locations within National Parks where motor vehicles travel—roads and parking lots—are even more sensitive, as roads and parking lots are extensively regulated thoroughfares frequented by large numbers of strangers, including children. Thus, unlike a home or other private property, where the "need for defense of self, family, and property is most acute," the locations in National Parks where vehicles travel, like schools and government buildings, are sensitive places where the Second Amendment leaves the judgment of whether (and if so, how) to regulate firearms to the legislature, not the judiciary.

*United States v. Masciandaro*, 648 F. Supp. 2d 779, 790 (E.D. Va. 2009), aff'd, 638 F.3d 458 (4th Cir. 2011). However, the Fourth Circuit's opinion affirming this ruling was abrogated by *Bruen*, thus this characterization of national park roads as "sensitive places" is no longer good law.

Similarly, in the 2009 case *Nordyke v. King*, the Ninth Circuit upheld a county ordinance

prohibiting carrying firearms on "open space venues, such as County-owned parks, recreational areas, historic sites, parking lots of public buildings . . . and the County fairgrounds," in large part because the court believed that large gatherings of people made them sensitive places in the same category as schools and government buildings. *Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009), but the opinion was vacated after the Supreme Court's opinion in *McDonald*. Thus, this broader definition of sensitive places as recreational spaces where large groups gather is no longer tenable.

Indeed, given the narrow-accepted definition of "sensitives places" the Court is skeptical of designating an entire national park—in this case one measuring nearly 760,000 acres or 1,200 square miles[12]—a sensitive place. Some pre-*Bruen* cases have allowed regulations on firearms to extend to the area immediately around a sensitive place—such as school zones, *United States v. Redwood*, 2016 WL 4398082 (N.D. Ill. Aug. 18, 2016), post office parking lots, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1127 (10th Cir. 2015), and a parking lot 1,000 feet away from the entrance to the U.S. Capitol and a block from the Rayburn House Office Building, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019), abrogated by *Bruen*, 597 U.S. 1. While Yosemite National Park arguably may contain sensitive places, i.e., the Yosemite Court, government buildings and schools, "the Court is aware of no case suggesting that properly designating one location a 'sensitive place' allows the government to give the same designation to a different, non-adjacent location." *See Solomon v. Cook County Bd. Of Comm'rs*, 559 F.Supp.3d 675, 693-94 (N.D. Ill. 2021) (rejecting designation of entire state forest, comprising 70,000 acres and at least 320 distinct areas, as a sensitive place). And because the Government has not established that the location where Gearheart was arrested in possession of a loaded weapon was a "sensitive place" within the accepted definition of that term, the Court declines to find that the challenged regulation should be upheld on that basis alone.

////

////

---

[12] *See* https://www.nps.gov/yose/learn/management/statistics.htm (last visited: April 18, 2024).

Accordingly, it is **ORDERED**:

Defendant's Motion to Dismiss (Doc. No. 11) is DENIED.

Dated:   April 18, 2024

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE